Jessica L. Blome (Cal. Bar No. 314898)
Lily A. Rivo (Cal. Bar No. 242688)
Richard A. Brody (Cal. Bar No. 100379)
GREENFIRE LAW, PC
2478 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fax: (510) 900-9502
Email: jblome@greenfirelaw.com
        lrivo@greenfirelaw.com
        rbrody@greenfirelaw.com

*Attorneys for Plaintiff US Right to Know*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| U.S. RIGHT TO KNOW, a California Non-Profit Corporation,<br><br>        Plaintiff,<br><br>     vs.<br><br>NATIONAL INSTITUTES OF HEALTH,<br><br>        Defendant. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Freedom of Information Act, 5 U.S.C. § 552 *et seq* |

**INTRODUCTION**

1.      Through this action, Plaintiff U.S. Right to Know (USRTK) seeks access to government records held by Defendant National Institutes of Health (NIH), pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq.,* and United States Department of Health & Human Services FOIA regulations promulgated thereunder, 45 C.F.R. Part 5. This action challenges Defendant's unlawful failure to abide by the statutory requirements of FOIA and applicable implementing regulations.

2.      Defendant is unlawfully withholding from public disclosure information sought by USRTK, information to which USRTK is entitled and for which no valid disclosure exemption applies or has been properly asserted.  In particular, Defendant has violated, and remains in violation of, the statutory mandates imposed by the FOIA by: (Count I) failing to provide a timely final determination on USRTK's FOIA Requests; (Count II) unlawfully withholding records from public disclosure for which no valid disclosure exemption applies or has been properly asserted, or to provide the reasonably segregable portions of those records; and (Count III) failing to provide an updated "estimated date of completion."

3.      The records requested by USRTK are likely to contribute significantly to the understanding of the operations or the activities of the government. USRTK is a 501(c)(3) nonprofit organization and, by its nature, has no commercial interest in the requested records.

4.      USRTK seeks declaratory relief establishing that Defendant has violated the FOIA and that such actions entitle USRTK to relief thereunder. USRTK also seeks injunctive relief directing Defendant to conduct a reasonably adequate search for records and to promptly provide responsive material, to reasonably segregate portions of non-exempt records, and to provide proper justifications for any disclosure exemptions that are applied. Finally, USRTK requests that the Court award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction pursuant to 5 U.S.C. section 552(a)(4)(B). That provision of the FOIA grants jurisdiction to "the district court of the United States in the district in which the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

complainant resides or has his principal place of business[.]" 5 U.S.C. § 552(a)(4)(B).  USRTK is a nonprofit public benefit corporation organized under the Nonprofit Public Benefit Corporation Law for charitable purposes.  USRTK was incorporated in the State of California in May 2014.  USRTK maintains its principal place of business in the Northern District of California.

6.    This Court also has federal question jurisdiction pursuant to 28 U.S.C. section 1331 because this action arises under the FOIA and the Declaratory Judgment Act, 28 U.S.C. section 2201 *et seq*.

## INTRADISTRICT ASSIGNMENT

7.    Pursuant to Local Rule 3-2(c), this case is properly brought in the San Francisco Division of the Northern District of California, because a substantial part of the events and omissions which give rise to the claims alleged herein occurred in the County of San Francisco.

8.    Under the FOIA, 5 U.S.C. § 522(a)(4)(B), jurisdiction vests in the district court where "the complainant resides" or "has his principal place of business."

9.    Plaintiff has its principal place of business in the County of San Francisco.

10.    As such, under the L.R. 3-2(c), (d), intradistrict assignment to the San Francisco division is proper.

## PARTIES

11.    Plaintiff USRTK is a 501(c)(3) nonprofit corporation organized under the laws of the State of California. USRTK is a public interest, investigative research group focused on promoting transparency for public health. USRTK works nationally and globally to expose corporate wrongdoing and government failures that threaten the integrity of food systems, the environment, and human health.

12.    Defendant NIH is an agency of the United States executive branch.

13.    Defendant NIH qualifies as an "agency" under the FOIA, the records sought are "records" under the FOIA, and because Defendant NIH is in possession and control of the records sought by USRTK, the NIH is subject to the FOIA pursuant to 5 U.S.C. §552(f).

**LEGAL FRAMEWORK**

14.     The FOIA requires U.S. government agencies to "promptly" make public records available to any person if that person makes a request which (1) reasonably describes the records sought and (2) complies with any applicable agency rules for making such a request. 5 U.S.C. § 552(a)(3)(A).

15.     The FOIA requires an agency to issue a final determination on any such information request within twenty business days from the date of its receipt. 5 U.S.C. § 552(a)(6)(A)(i). In issuing a final determination, an agency is required to inform the requester of three things: (1) the agency's determination of whether or not it must comply with the request; (2) the reasons for its decision; and (3) notice of the right of the requester to appeal to the head of the agency. 5 U.S.C. § 552(a)(6)(A)(i).

16.     The FOIA allows an agency to extend the twenty-day determination deadline, however, by ten working days when "unusual circumstances" exist and when the agency so notifies a requester in writing. 5 U.S.C. § 552(a)(6)(B)(i)-(iii); 45 C.F.R. § 5.24(f). A notice informing a requester of the invocation of the "unusual circumstances" provision must specify the applicable "unusual circumstances." *Id*.

17.     Permissible "unusual circumstances" are limited to: "(I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request; (II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or (III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein." 5 U.S.C. § 552(a)(6)(B)(iii).

18.     An agency is entitled to one ten-business day extension. 5 U.S.C. § 552(a)(6)(B)(i). The written notice provided to the requester must specify the specific unusual circumstances justifying the extension and the date on which a final determination is expected to be dispatched. *Id*.; 45 C.F.R. § 5.24(f).

19.     In some circumstances, the FOIA allows an agency to invoke an extension beyond ten days. To invoke a longer extension, the FOIA requires an agency to provide written notification to the requester that (1) offers the requester an opportunity to limit the scope of the request so that it may be processed within that time limit, or (2) offers the requester an opportunity to arrange with the agency an "alternative time frame" for processing the request. 5 U.S.C. § 552(a)(6)(B)(ii); 45 C.F.R. § 5.24(f).

20.     As part of invoking an "alternative time frame" extension, the agency must also make available to the requester its FOIA Public Liaison, who is tasked to resolve any dispute between the requester and the agency. 5 U.S.C. § 552(a)(6)(B)(ii); 45 C.F.R. § 5.24(f).

21.     FOIA Public Liaisons "shall serve as supervisory officials" and "shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes." 5 U.S.C. § 552(l).

22.     Even when an "unusual circumstances" extension is made, the agency must still notify the requester of its expected date on which a final determination will be dispatched. 5 U.S.C. § 552(a)(6)(B)(i); 45 C.F.R. § 5.24(f) ("Whenever we cannot meet the statutory time limit for processing a request because of 'unusual circumstances,' as defined in the FOIA, and we extend the time limit on that basis, we will notify you, before expiration of the 20-day period to respond and in writing of the unusual circumstances involved and of the date by which we estimate processing of the request will be completed.").

23.     "Exceptional circumstances" for failure to comply with applicable time limits "does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii).

24.     If an agency fails to provide a final determination on a FOIA request within the statutory timeframe, the requester is deemed to have exhausted its administrative remedies and may immediately file suit against the agency. 5 U.S.C. § 552(a)(6)(C)(i).

25.     The FOIA also requires agencies to provide "an estimated date on which the agency will complete action on the request." 5 U.S.C. § 552(a)(7)(B)(ii); *see also* 5 U.S.C. § 552(a)(6)(B)(i).

26.     Agencies shall make reasonable efforts to maintain their records so they are reproducible for FOIA purposes, and "shall make reasonable efforts to search" for responsive records. 5 U.S.C. § 552(a)(3)(B), (C). The term "search" "means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request." 5 U.S.C. § 552(a)(3)(D).

27.     In furnishing records responsive to a request under the FOIA, an agency may, for a limited set of categories of information, exclude or withhold such information from disclosure. 5 U.S.C. § 552(b). However, even where proper justification exists for withholding such information, the agency must provide the remaining portions of records that are reasonably segregable from the properly withheld portions thereof. *Id.*

28.     Except in certain circumstances, when an agency produces a record in response to a FOIA request but withholds a portion thereof, the agency must indicate the volume of information withheld and the exemption under which such information has been withheld. *Id.*; 5 U.S.C. § 552(a)(6)(F).

29.     An agency that withholds public records from a requestor under the FOIA bears the burden of sustaining the legality of its action. 5 U.S.C. § 552(a)(4)(B).

30.     Requesters under the FOIA may ask that an agency waive fees associated with any request for records "if disclosure of the information is in the public interest because it is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

31.     An agency may only charge certain fees depending on the category of requester. For non-commercial requesters such as USRTK, "fees shall be limited to reasonable standard charges for document search and duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(III).

32.     Agencies are prohibited from assessing search fees if the agency fails to comply with the FOIA's twenty-day determination deadline or any lawful extension under the statute's "unusual circumstances" provisions. 5 U.S.C. § 552(a)(4)(A)(viii).

33.     This Court has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant, pursuant to 5 U.S.C. § 552(a)(4)(A)(i)(B).

## STATEMENT OF OPERATIVE FACTS

### FOIA Request One

34.     On June 11, 2024, USRTK submitted a two-part FOIA Request to the NIH (referred to herein as "Request One"). USRTK submitted Request One to the NIH by e-mailing Request One to Gorka Garcia-Malene, Freedom of Information Officer for the NIH, at his NIH address for submission of FOIA requests, nihfoia@od.nih.gov. Request One sought a waiver of all fees associated with processing the request. A true and accurate copy of Request One is attached hereto as **Exhibit A** and is incorporated by reference as though set forth in full herein.

35.     Gorka Garcia-Malene has been the Freedom of Information ("FOIA") Officer for the NIH since October 15, 2017. He held that position as recently as May 13, 2025. Declaration of Gorka Garcia-Malene in the case of *US Right to Know v. National Institutes of Health*, Case Number 23-cv-02954 (D.C. Northern District of California), **ECF No. 39-1**, filed May 13, 2025, ¶1. A true and accurate copy of the Gorka Garcia-Malene Declaration is attached hereto as **Exhibit C** and is incorporated by reference as though set forth in full herein.

36.     As the NIH-FOIA Officer, Mr. Garcia-Malene is responsible for supervising and directing the day-to-day activities of the NIH FOIA Office ("NIH FOIA"). (**Exh. C.** ¶2).

37.     NIH-FOIA typically receives FOIA requests via its electronic FOIA review platform. (**Exh. C.** ¶10).

38.     USRTK submitted Request One to NIH-FOIA via NIH-FOIA's electronic FOIA review platform.

39.     USRTK has no commercial interest or value in records responsive to Request One.

40.     The records requested by USRTK are likely to contribute significantly to the public understanding of the operations and activities of the government, especially as they pertain to apparent attempts by NIH personnel to evade the Federal Records Act and the Freedom of Information Act, and the destruction of Federal records.  (**Exh. A., pg. 9**).

41.     USRTK has a demonstrated track record of obtaining and disseminating information obtained under the FOIA and state public records laws concerning public health. Since 2015, USRTK has obtained, posted online, and reported on thousands of industry and government documents gathered via public records requests. USRTK's work has contributed to three New York Times investigations, 15 academic papers in public health journals, 13 articles in the BMJ, one of the world's leading medical journals, and global media coverage documenting how food and chemical corporations impact public health and the environment. USRTK's staff has expertise in investigative journalism and advanced research, especially as it concerns impacts on human health. (https://usrtk.org/about-u-s-right-to-know/).  USRTK is a recognized news outlet and is a member of the Institute for Nonprofit News, a membership organization that supports and advocates for the growth and sustainability of the nonprofit news sector; it has a network of over 400 local to global, topic-specific, and investigative nonprofit news organizations and over 3,000 practitioners dedicated to public service journalism.

42.     USRTK's investigation of the origins of COVID-19 has been featured in news outlets around the world, including the Wall Street Journal, New York Times, Washington Post, USA Today, New Yorker, Vanity Fair, Science, the BMJ, Journal of Medical Ethics and many other outlets. (https://usrtk.org/about-u-s-right-to-know/).

43.     In February 2025, USRTK received the James Madison Freedom of Information Award from the Society for Professional Journalists Northern California chapter.  This award recognizes people and organizations that have made "significant contributions to advancing freedom of information and expression in the spirit of James Madison, the creative force behind the First Amendment."  The award states in part that:

> By filing more than 160 requests under the Freedom of Information Act, initiating 30 lawsuits to uncover documents held by federal

officials, and combing through tens of thousands of documents, U.S.
Right to Know unearthed crucial information about the potential
origins of COVID-19 and the high-risk research being conducted at
the Wuhan Institute of Virology.

https://spjnorcal.org/2025/02/12/spj-norcal-honors-transparency-champions-in-james-madison-freedom-of-information-awards-3/

44.    USRTK shares its findings with media outlets, public health and medical journals, and through its own library of information, available online at: <https://www.usrtk.org>. Many of USRTK's documents are available through the USRTK Agrichemical Collection of the University of California, San Francisco's (UCSF) Chemical Industry Documents Archive, available online at: <https://www.industrydocuments.ucsf.edu/chemical/collections/usrtk-agrichemical-collection/>, and the USRTK Food Industry Collection of the UCSF Food Industry Documents Archive, available online at: <https://www.industrydocuments.ucsf.edu/food/collections/usrtk-food-industry-collection/.

45.    USRTK did not receive any communications from the NIH following the submission of Request One on June 11, 2024.

46.    On August 5, 2024, approximately two months after submitting Request One, USRTK wrote to Gorka Garcia-Malene, Freedom of Information Officer, regarding Request One. USRTK stated that it had not received an acknowledgment of its Request, or information about when USRTK should expect to receive an official "determination" on its request, as required by the FOIA, 5 U.S.C. §552(a)(6)(B)(i).  In its letter, USRTK formally demanded that the NIH, within 10 business days, provide USRTK with an official determination on Request One, or at the very least, a date certain by which USRTK should expect to receive such a determination.  USRTK also requested that the NIH address its request for a fee waiver in a timely manner. Finally, USRTK asked that the NIH provide an estimated completion date that complied with the FOIA's requirements to promptly make records available on request.

47.    USRTK did not receive any communications from the NIH following the submission of the August 5, 2024, letter.

48.     On October 9, 2024, approximately four months after submitting Request One, USRTK again wrote to Gorka Garcia-Malene, Freedom of Information Officer at the NIH, regarding the Request.  This letter referenced USRTK's August 5, 2024, letter sent to Mr. Garcia-Malene. USRTK again stated that it had not received an acknowledgment of Request One, or information about when USRTK should expect to receive an official "determination" on its request, as required by the FOIA, 5 U.S.C. §552(a)(6)(B)(i).  In its letter, USRTK again formally demanded that the NIH, within 10 business days, provide USRTK with an official determination on the Request, or at the very least, a date certain by which USRTK should expect to receive such a determination.  USRTK again requested that the NIH address its request for a fee waiver in a timely manner.  Finally, USRTK again asked that the NIH provide an estimated completion date that complied with the FOIA's requirements to promptly make records available on request.

49.     USRTK did not receive any communications from the NIH following the submission of the October 9, 2024, letter.

50.     On February 19, 2025, approximately eight months after USRTK's submission of Request One, counsel for USRTK sent a letter to Mr. Garcia-Malene, reciting the history of USRTK's Request One submission, as well as the two subsequent follow up letters.  Counsel for USRTK requested that the NIH respond within 10 business days with (1) a specific and reasonable response schedule, and (2) a fee waiver determination.  Counsel for USRTK also requested that Mr. Garcia-Malene provide written confirmation of his receipt of the letter, which was sent by electronic mail to the electronic mailbox at the NIH used by Mr. Garcia-Malene.

51.     Neither counsel for USRTK nor USRTK itself ever received any communications from Mr. Garcia-Malene or anyone at the NIH following the submission of the February 19, 2025, letter.

52.     To date, USRTK and its legal counsel have received no communications from the NIH about Request One.

53.     To date, the NIH has not provided USRTK or its legal counsel with an estimated date of completion.

54.    To date, the NIH has not provided USRTK or its legal counsel with a timely and lawful "determination" that informs USRTK of (1) the NIH's determination of whether or not to comply with Request One; (2) the reasons for its decision; and (3) notice of USRTK's right to appeal to the head of the agency. 5 U.S.C. §552(a)(6)(A)(i).

55.    At no time has the NIH lawfully invoked the FOIA's "unusual circumstances" exception to the FOIA's twenty-day determination deadline.

56.    The NIH has not shown due diligence in responding to the Request. 5 U.S.C. §552(a)(6)(C)(i).

57.    To date, the NIH has failed to issue a decision on USRTK's request for a waiver of fees associated with the processing of Request One.

58.    To date, the NIH has not produced a single record responsive to Request One.

59.    USRTK has constructively exhausted all administrative remedies required by the FOIA. 5 U.S.C. § 552(a)(6)(A), (a)(6)(C).

60.    Due to the failure of the NIH to comply with the FOIA, USRTK has been forced to retain the services of counsel and to expend funds litigating Defendant NIH's unlawful actions and omissions under the FOIA.

**FOIA Request Two**

61.    On July 18, 2024,  USRTK submitted a FOIA request to Gorka Garcia-Malene, FOIA Officer, at the NIH.  This FOIA request is referred to herein as Request Two.  USRTK submitted Request Two to the NIH by e-mailing Request Two to Gorka Garcia-Malene, Freedom of Information Officer for the NIH, at his NIH address for submission of FOIA requests, nihfoia@od.nih.gov.  Request Two sought a waiver of all fees associated with processing the request. A true and accurate copy of Request Two is attached hereto as **Exhibit B** and is incorporated by reference as though set forth in full herein. A true and accurate copy of Attachment #1 and Attachment #2 to Request Two are attached hereto as **Exhibit B-1** and **Exhibit B-2** respectively.

62.    The e-mail address to which Request Two was submitted was then and is now the NIH-FOIA's electronic FOIA review platform.

63.    USRTK has no commercial interest or value in records responsive to Request Two.

64.    The records requested by USRTK are likely to contribute significantly to the public understanding of the operations and activities of the government, especially as they pertain to the NIH's knowledge of EcoHealth Alliance's coronavirus research activities in partnership with the Wuhan Institute of Virology.  (**Exh. B., pg. 4**).

65.    After submitting Request Two on July 18, 2024, USRTK did not receive any communications from the NIH.

66.    On October 5, 2024, USRTK sent a letter via email to Gorka Garcia-Malene at the NIH FOIA email address, in which it sought a Request for Acknowledgement, Determination and ECD for Request Two.  In this letter, USRTK stated that it had not yet received an acknowledgement of request, or information about when USRTK should expect to receive an official determination, as required by FOIA, 5 U.S.C. §552(a)(6)(B)(i). USRTK formally demanded that the NIH provide an official determination or a date certain for issuance of an official determination within 10 business days.

67.    The NIH did not provide USRTK any communication following the submission of USRTK's October 5, 2024, correspondence.

68.    On October 27, 2024, USRTK sent a letter via email to Gorka Garcia-Malene at the NIH FOIA email address, again containing USRTK's Request for Acknowledgement, Determination and ECD for Request Two.  The October 27, 2024, letter stated that no response had been received to USRTK's October 5, 2024, request for official determination. The October 27, 2024, letter also stated that USRTK had not yet received an acknowledgement of request, or information about when USRTK should expect to receive an official determination, as required by FOIA, 5 U.S.C. §552(a)(6)(B)(i).  The October 27, 2024, letter from USRTK to the NIH demanded that an official determination or a date certain for issuance of an official determination be provided within 10 business days.

69.    The NIH failed to respond to USRTK following the submission of USRTK's October 27, 2024, correspondence.

70.     On February 19, 2025, approximately seven months after USRTK's submission of Request Two, counsel for USRTK sent a letter to Mr. Garcia-Malene via email at official NIH email addresses, reciting the history of the submission of Request Two by USRTK, as well as the two subsequent follow up letters.  Counsel for USRTK requested that the NIH respond within 10 business days with (1) a specific and reasonable response schedule, and (2) a fee waiver determination.  Counsel for USRTK also requested that Mr. Garcia-Malene provide written confirmation of his receipt of the letter, which was sent by electronic mail to the electronic mailbox at the NIH used by Mr. Garcia-Malene.

71.     The NIH, including Mr. Garcia Malene or another individual, never responded to counsel for USRTK or USRTK following the submission of the February 19, 2025, letter.

72.     To date, USRTK and its legal counsel have received no communications from the NIH concerning Request Two.

73.     To date, the NIH has not provided USRTK or its legal counsel with an estimated date of completion.

74.     To date, the NIH has not provided USRTK or its legal counsel with a timely and lawful "determination" that informs USRTK of (1) the NIH's determination of whether or not to comply with Request Two; (2) the reasons for its decision; and (3) notice of USRTK's right to appeal to the head of the agency. 5 U.S.C. §552(a)(6)(A)(i).

75.     At no time has the NIH lawfully invoked the FOIA's "unusual circumstances" exception to the FOIA's twenty-day determination deadline.

76.     The NIH has not shown due diligence in responding to the Request. 5 U.S.C. §552(a)(6)(C)(i).

77.     To date, the NIH has failed to issue a decision on USRTK's request for a waiver of fees associated with the processing of Request Two.

78.     To date, the NIH has not produced a single record responsive to Request Two.

79.     USRTK has constructively exhausted all administrative remedies required by the FOIA. 5 U.S.C. § 552(a)(6)(A), (a)(6)(C).

80.    Due to the failure of the NIH to comply with the FOIA, USRTK has been forced to retain the services of counsel and to expend funds litigating Defendant NIH's unlawful actions and omissions under the FOIA.

## CAUSES OF ACTION

### COUNT I

**Violations of the Freedom of Information Act and HHS Regulations:**
**Failure to Provide Timely Final Determination**

81.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

82.    USRTK has a statutory right to have Defendant process its FOIA requests in a manner that complies with the FOIA. USRTK's rights in this regard were violated by Defendant's failure to provide a timely and legally adequate final determination for Request One and Request Two.

83.    To date, approximately ten months after Request One was submitted and approximately nine months after Request Two was submitted, USRTK has not received any written communication from Defendant NIH about whether the Agency will comply with the FOIA Request, the Defendant's reasons for making that decision, and any right of USRTK to administratively appeal that decision. 5 U.S.C. § 552(a)(6)(A)(i); 45 C.F.R. Part 5.

84.    Based on the nature of USRTK's organizational activities, USRTK will continue to employ the FOIA's provisions to request information from Defendant in the foreseeable future. These activities will be adversely affected if Defendant is allowed to continue violating the FOIA's response deadlines.

85.    Unless enjoined and made subject to a declaration of USRTK's legal rights by this Court, Defendant will continue to violate USRTK's rights to receive public records under the FOIA.

86.    Defendant's failure to make a final determination on the FOIA Request One and FOIA Request Two within the statutory timeframe has prejudiced USRTK's ability to timely obtain public records.

## COUNT II
### Violation of the Freedom of Information Act:
### Unlawful Withholding of Non-Exempt Public Records

87.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

88.    USRTK has a statutory right to have Defendant NIH process its FOIA requests in a manner that complies with the FOIA. USRTK's rights in this regard were violated when Defendant failed to promptly provide public, non-exempt records to USRTK in response to the two FOIA Requests, 5 U.S.C. §§ 552(a)(3)(A) & (b), to provide a reasonable estimate of the volume of withheld records, 5 U.S.C. § 552(a)(6)(F), and to reasonably segregate all non-exempt portions of otherwise exempt material, 5 U.S.C. § 552(b).

89.    Defendant is unlawfully withholding public disclosure of information sought by USRTK, information to which it is entitled and for which no valid disclosure exemption applies.

90.    USRTK has constructively exhausted its administrative remedies with respect to Request One and Request Two.

91.    USRTK is entitled to injunctive relief to compel production of all non-exempt, responsive records.

92.    Based on the nature of USRTK's organizational activities, USRTK will undoubtedly continue to employ FOIA's provisions to request information from Defendant in the foreseeable future.

93.    USRTK's organizational activities will be adversely affected if Defendant is allowed to continue violating FOIA's response deadlines as it has in this case.

94.    Unless enjoined and made subject to a declaration of USRTK's legal rights by this Court, Defendant will continue to violate the rights of USRTK to receive public records under the FOIA.

## COUNT III

### Violation of the Freedom of Information Act:
### Failure to Provide Estimated Date of Completion

95.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

96.    USRTK has a statutory right to have Defendant process FOIA Request One and FOIA Request Two in a manner that complies with the FOIA. USRTK's rights in this regard were violated by Defendant's unlawful failure to provide an estimated date of completion for Request One and Request Two, as required by the FOIA, 5 U.S.C. § 552(a)(7)(B)(ii).

97.    USRTK formally requested that the NIH provide an estimated date of completion for both Request One and Request Two.  No such date was provided by the NIH.

98.    Based on the nature of USRTK's organizational activities, USRTK will continue to employ FOIA's provisions to request information from Defendant NIH in the foreseeable future. These activities will be adversely affected if Defendant is allowed to continue violating the FOIA's requirements for providing USRTK with an estimated date of completion on FOIA Request One and FOIA Request Two.

99.    Unless enjoined and made subject to a declaration of USRTK's legal rights by this Court, Defendant NIH will continue to violate the rights of USRTK to receive public records under the FOIA.

## REQUEST FOR RELIEF

THEREFORE, USRTK prays that this Court:

1.    Order Defendant NIH to promptly provide USRTK all the information sought in this action and to immediately disclose the requested records for Request One and Request Two in unredacted format unless an exemption is properly claimed and properly applies.

2.    Declare Defendant NIH's failure to provide USRTK with a final determination for Request One and Request Two as unlawful under the FOIA.

3.    Declare Defendant NIH's failure to promptly provide USRTK with all non-exempt records responsive to Request One and Request Two as unlawful under the FOIA.

4.      Declare Defendant NIH's failure to provide USRTK with an estimated date of completion for Request One and Request Two, as required by 5 U.S.C. § 552(a)(7)(B)(ii), unlawful under the FOIA.

5.      Award USRTK its reasonable attorneys' fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E) or 28 U.S.C. § 2412.

6.      Grant such other and further relief to USRTK as the Court may deem just and proper.

Dated: May 28, 2025                          Respectfully Submitted,


By:    /s/ Richard A. Brody
       Jessica L. Blome
       Lily A. Rivo
       Richard A. Brody
       GREENFIRE LAW, PC
       2748 Adeline Street, Suite A
       Berkeley, CA 94703
       Telephone: (510) 900-9502
       Email: jblome@greenfirelaw.com
              lrivo@greenfirelaw.com
              rbrody@greenfirelaw.com

       *Attorneys for Plaintiff US Right to Know*

# EXHIBIT A

# R

**U.S. RIGHT TO KNOW**

*Pursuing truth and transparency for public health*

June 11, 2024

Gorka Garcia-Malene
Freedom of Information Officer
National Institutes of Health
Building 1, Room 344
1 Center Drive, MSC 0188
Bethesda, MD 20892-0188

**RE:     Freedom of Information Act request**

Dear Mr. Garcia-Malene:

This is a two-part request under the Freedom of Information Act, 5 U.S.C. § 552, et seq., to the National Institutes of Health (NIH).

**Part I**. We seek all records of email communications related to the origins of Covid-19 that have been deleted, or were attempted to be deleted, or were auto-deleted, or were conveyed on personal email accounts (including Gmail, Proton Mail or Tutanota) or text or ephemeral messaging apps (such as Signal, Whatsapp, Telegram, Confide or Wire) of NIH staff, including but not limited to:

- Anthony Fauci, former Director, National Institute of Allergy and Infectious Diseases (NIAID)
- David Morens, Senior Scientific Advisor, NIAID
- Francis Collins, former Director, NIH
- Greg Folkers, former Chief of Staff, NIAID
- H. Clifford Lane, Clinical Director, NIAID
- Erik Stemmy, Program Officer, NIAID
- Hugh Auchincloss, Principal Deputy Director, NIAID
- Gray Handley, former Associate Director for International Research Affairs, NIAID

Please carry out a thorough search for records related to key topics surrounding the origins of Covid-19, including but not limited to:

- The origin of Covid-19 or SARS-CoV-2
- The Wuhan wet market or Huanan Seafood Wholesale Market
- Cases of unusual pneumonia in September, October, or November 2019
- EcoHealth Alliance or Peter Daszak

- Wuhan Institute of Virology or Shi Zhengli or Ben Hu
- Ralph Baric
- James Le Duc
- Kristian Andersen

We request a subject matter search instead of a keyword search because NIH employees may have used intentional misspellings to avoid emails being discovered in a keyword search.[1]

**Exhibit 1**: June 4, 2021 email from Greg Folkers in which "EcoHealth" is misspelled as "Ec~Health"[2]



From: Folkers, Greg (NIH/NIAID) [E] ██████████ @niaid.nih.gov>
Sent: Friday, June 4, 2021 9:36 PM
To: NIAID OD AM <██████████ @niaid.nih.gov>; Billet, Courtney (NIH/NIAID) [E] ██████████ @niaid.nih.gov>; Routh, Jennifer (NIH/NIAID) [E] ██████████ @nih.gov>; Stover, Kathy (NIH/NIAID) [E] ██████████ @nih.gov>
Subject: ASF and all this may come up in interviews

In the recent Bulletin of the Atomic Scientists article, we have this quote

"It is clear that some or all of this work was being performed using a biosafety standard—biosafety level 2, the biosafety level of a standard US dentist's office—that would pose an unacceptably high risk of infection of laboratory staff upon contact with a virus having the transmission properties of SARS-CoV-2…."

My understanding is that human coronaviruses including sarbecoviruses are routinely worked at in BSL-2 around the world as are many other viruses that can cause problems for people. The BSL level designation is decided by each country and is not related to perceived pandemic potential but largely to risk to the BSL workers.

For example, BSL-4 designation generally means deadly virus, infectious by aerosol, no vaccine against it, and no treatment for it. So, although rabies is 100% fatal in humans, it can be prevented by a vaccine and prevented by a post exposure serum, and (probably if not totally) not infectious by aerosol, thus it is BSL-2 even though among the deadliest of human viruses.  Working with non-human coronaviruses at BSL-2 is widespread since these viruses are not known to infect humans.

David, Alan and others may have additional thoughts.

Attached is a fact sheet that I think comes from Ec~Health

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in reliance of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

MORENS_SUBPOENA_019411

[1] https://www.nytimes.com/2024/05/28/health/nih-officials-foia-hidden-emails-covid.html
[2] Released by the Select Subcommittee on the Coronavirus Pandemic and accessible at:
https://oversight.house.gov/release/wenstrup-investigates-nih-conspiracy-to-evade-foia-avoid-public-transparency/

**Exhibit 2:** June 7, 2021 email from Greg Folkers in which "Andersen" is misspelled as "anders$n"[3]



**Evidence of deleted NIH records related to the origins of COVID-19**

On June 29, 2023, *The Intercept* reported that Dr. David Morens assured prominent scientists and others at the center of the debate on COVID-19's origins that he will delete "any email that I don't want to see in the New York Times".

---

[3] Released by the Select Subcommittee on the Coronavirus Pandemic and accessible at: https://oversight.house.gov/wp-content/uploads/2024/05/2024.05.28-BRW-Letter-to-NIH-Re.-FOIA_Redacted.pdf

**Exhibit 3**: September 9, 2021 email from David Morens, released by *The Intercept*[4]



On May 22, 2024, Congressional staff from the Select Subcommittee on the Coronavirus Pandemic released additional emails from Dr. Morens which contain repeated statements that Dr. Morens intended to, and has, deleted email records that may contain sensitive information about the origins of COVID-19.

---

[4] Originally released by *The Intercept* and accessible at: https://theintercept.com/2023/06/29/covid-nih-personal-email-foia/

**Exhibit 4**: June 28, 2021 email from David Morens stating he deleted emails that would have been responsive to FOIA[5]

On Jun 28, 2021, at 4:10 PM, Morens, David (NIH/NIAID) [E] ████████@gmail.com> wrote:

Sorry!  On 18 April 2020, Peter Daszak emailed me and Tony, congratulating Tony on standing up for science.  That email somehow fell into the hands of the Congressman, probably via a FOIA of someone who didn't delete it, as I did (delete all of Peter's emails and others relating to origin) when the shit

BU04541

**BOSTON UNIVERSITY CONFIDENTIAL TREATMENT REQUESTED**

started hitting the fan.

Anyway the Congressman got a copy of Peter D's email from someone at NIH, and he now wants to get any reply Tony and I or anyone else may have sent back to Peter.  Mine was erased long ago ( I verified that today) and I feel pretty sure Tony's was too.  The best way to avoid FOIA hassles is to delete all emails when you learn a subject is getting sensitive...  In any case, there is notthing here except opportunities to hassle, harrass, and huff and puff....

d

---

[5] Released May 22, 2024 by the Select Subcommittee on the Coronavirus Pandemic and accessible at:
https://oversight.house.gov/wp-content/uploads/2024/05/SSCP-Staff-Memo_Morens-5.22.pdf

**Exhibit 5**: October 5, 2021 email from David Morens to Peter Daszak stating he deleted an email[6]



**From:** David Morens ▮▮▮▮▮@gmail.com>
**Sent:** Tuesday, October 5, 2021 6:28 PM
**To:** Peter Daszak ▮▮▮▮▮@ecohealthalliance.org>
**Subject:** Re:Talking with Elizabeth Warren's staff

Peter, i just got news that a foia picked up an email i sent you saying that tony commented he was braindead, jokingly of course. However, Ron Johnson is all over it and now after me. Tony will be pissed, rightly so. I deleted that email but i now learn that every email i ever got/sent since 1998 is captured and will be turned over, whether or not i instantly deleted it.

Gmail, phone, text…. i need to scrupulously rely on those exclusively. d

Sent from my iPhone
David M Morens
OD, NIAID, NIH

Further, Dr. Morens has implied that deletion of federal records may be a common practice among other NIH employees. In an email to Peter Daszak, president of EcoHealth Alliance, he wrote: "We are all smart enough to know to never have smoking guns, and if we did we wouldn't put them in emails and if we found them we'd delete them."

**Exhibit 6:** June 2020 email from David Morens to Peter Daszak[7]

| Date: | Tue, 16 Jun 2020 2:22:55 PM -0400 |
|---|---|
| Sent: | Tue, 16 Jun 2020 2:22:54 PM -0400 |
| Subject: | Re:Two reporters might contact you in the next couple of weeks. |
| From: | "Morens, David (NIH/NIAID) [E]▮▮▮▮▮@gmail.com> |
| To: | Peter Daszak▮▮▮▮▮@ecohealthalliance.org>; |
| CC: | Gerald Keusch▮▮▮▮▮h@bu.edu>; Robert Kessler▮▮▮▮▮@ecohealthalliance.org>; Aleksei Chmura ▮▮▮▮▮@ecohealthalliance.org>; |

The FOIAs are dreadful and paranoia-inducing. In the old days we had to do them ourselves, by hand. I mean finding and printing out thousands of emails coming in and going out. Now they sometimes FOIA text messages too. Many FOIAs turn up thousands of pages of docs, and of course, most of meaningless. We are all smart enough to know to never have smoking guns, and if we did we wouldn't put them in emails and if we found them we'd delete them. In my 22 years at NIAID I have never seen a FOIA that turned up useful information   d

---

[6] Released May 22, 2024 by the Select Subcommittee on the Coronavirus Pandemic and accessible at: https://oversight.house.gov/wp-content/uploads/2024/05/SSCP-Staff-Memo_Morens-5.22.pdf
[7] Ibid.

**Part II.** We request a complete and thorough search of records held by the NIH for electronic correspondence (including electronic communications via email, texts, Signal, and other ephemeral messaging applications, as well as personal email accounts) about making potentially embarrassing NIH records disappear, or how to make such records disappear, including deleting records after a FOIA request is filed. Please search records to or from the following employee – including attachments, CC and BCC – and any other employee who may have such records:

- Margaret "Marg" Moore, former staff, NIH/NIAID FOIA Office

**Alleged activity at the NIH FOIA office assisting employees to "make records disappear"**

According to Dr. Morens's emails released by the Select Subcommittee, personnel at the NIH FOIA office assisted him in shielding his emails from FOIA by making them "disappear" after receiving a FOIA request but before the search began.

**Exhibit 7:** February 24, 2025 email from David Morens referencing making emails "disappear"[8]



Around the same time, Dr. Morens wrote in another email on the topic of FOIAs that he had learned "the tricks" from Marg Moore of the NIH FOIA Office.

---

[8] Released May 22, 2024 by the Select Subcommittee on the Coronavirus Pandemic and accessible at: https://oversight.house.gov/wp-content/uploads/2024/05/SSCP-Staff-Memo_Morens-5.22.pdf

**Exhibit 8**: February 25, 2021 email from David Morens to Gerald Keusch[9]



> -----Original Message-----
> From: Morens, David (NIH/NIAID) [E] [████]@gmail.com>
> Sent: Thursday, February 25, 2021 12:06 PM
> To: Keusch, Gerald T [████] @bu.edu>
> Cc: Peter Daszak ([████]@ecohealthalliance.org)
> [████] @ecohealthalliance.org >
> Subject: Re: Briefing Tony
>
> It's more in the line of govt secret, but too comp;licated to explain in an
> email. But I learned the tricks last year from an old friend, Marg Moore,
> who heads our FOIA office and also hates FOIAs.
>
> MORENS_SUBPOENA_015237
>
> Incidentally, Tony and I and a few other people here all got a huge FOIA
> yesterday seeking any and all documents, emails, etc., that mention the
> words "Wuhan Institute" or "WIV". It appears that this comes from folks
> tied to politics, who want specifically to know about anything NIH has had
> to do with WIV, or any scientists working with WIV. The original request
> was I think far broader, but we negotiated it down to just those two terms.
> You names will not show up in this FOIA, at least not from my info. d
>
> --
> david....... PS, I will be on Public Health Service deployment from 10
> December 2020 until 23 January 2021. During this time I will have limited
> access to email and phone contact. Ty, dmm

We request that you disclose these documents and materials as they become available to you, without waiting until all the documents have been assembled. If documents are denied in whole or in part, please specify which exemption(s) is (are) claimed for each passage or whole document denied. Give the number of pages in each document and the total number of pages pertaining to this request and the dates of documents withheld. We request that excised material be "blacked out" rather than "whited out" or cut out and that the remaining non-exempt portions of documents be released as provided under the Freedom of Information Act.

Please advise of any destruction of records and include the date of and authority for such destruction. As we expect to appeal any denials, please specify the office and address to which an appeal should be directed.

## REQUEST FOR FEE WAIVER

FOIA was designed to provide citizens a broad right to access government records. FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to." *NARA v. Favish*, 541 U.S. 157, 171 (2004) quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773-

---

[9] Ibid.

74 (1989) (internal quotation and citations omitted). In order to provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard. 5 U.S.C. § 552(a)(4)(A)(iii). FOIA's fee waiver requirement is "liberally construed." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations such as U.S. Right to Know access to government records without the payment of fees. Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*." *Ettlinger v. FBI*, 596 F. Supp. 867, 872 (D. Mass. 1984) (emphasis added). As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information ... ." 132 Cong. Rec. S. 14298 (statement of Senator Patrick Leahy).

**I. U.S. Right to Know Qualifies for a Fee Waiver.**

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

Thus, the NIH must consider six factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably broad audience of persons interested in the subject, (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities. *Id*. § 2.107(1)(2), (5) whether a commercial interest exists and its magnitude, and (6) the primary interest in disclosure. As shown below, U.S. Right to Know meets each of these factors.

**A. The Subject of This Request Concerns "The Operations and Activities of the Government."**

The subject matter of this request concerns the operations and activities of the NIH. This request is about apparent attempts by NIH personnel to evade the Federal Records Act and the Freedom of Information Act, and the destruction of federal records.

This FOIA will provide U.S. Right to Know and the public with crucial insight into the activities of the NIH in relation to its employees' apparently willful evasion of the Federal Records Act and the Freedom of Information Act, as well as its knowledge on the origins of COVID-19 which may have been previously shielded from the public due to destruction of records. It is clear that a

federal agency's oversight of health, safety and security threats, both foreign and in the U.S. is a specific and identifiable activity of the government, and in this case it is the executive branch agency of the NIH. *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires with regard to this factor") (internal quotations omitted). Thus, U.S. Right to Know meets this factor.

### B. Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will allow U.S. Right to Know to convey to the public information about the NIH's activities in relation to the origins of COVID-19, as well as its employee's conduct in apparently attempting to evade laws that are central to public oversight of federal agencies such as NIH. Once the information is made available, U.S. Right to Know will analyze it and present it to the general public in a manner that will meaningfully enhance the public's understanding of this topic.

Thus, the requested records are likely to contribute to an understanding of the NIH's operations and activities.

### C. Disclosure of the Requested Records Will Contribute to a Reasonably Broad Audience of Interested Persons' Understanding of the NIH's Activities Concerning the Origins of COVID-19

The requested records will contribute to public understanding of whether the NIH's actions concerning the origins of COVID-19 were consistent with its purpose and mission to "exemplify and promote the highest level of scientific integrity, public accountability, and social responsibility in the conduct of science." As explained above, the records will contribute to public understanding of this topic.

Activities of the NIH generally, and specifically its roles in investigating the origins of COVID-19, are areas of interest to a reasonably broad segment of the public. U.S. Right to Know will use the information it obtains from the disclosed records to educate the public at large about this topic. *See W. Watersheds Proj. v. Brown*, 318 F. Supp.2d 1036, 1040 (D. Idaho 2004) (finding that "WWP adequately specified the public interest to be served, that is, educating the public about the ecological conditions of the land managed by the BLM and also how ... management strategies employed by the BLM may adversely affect the environment").

Through U.S. Right to Know's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained in and gleaned from the requested records will

10

contribute to a broad audience of persons who are interested in the subject matter. *Ettlinger v. FBI*, 596 F. Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dept. of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev.*, 405 F. Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records, which are not currently in the public domain. *See Cmty. Legal Servs.*, 405 F. Supp.2d at 560 (because requested records "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public."). As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations... ."1[1]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to public understanding of NIH's activities related to Dr. Morens's communications with EcoHealth Alliance, which are central to discussions about the origin of COVID-19. The public is always well served when it knows how the government conducts its activities. Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about this pressing issue.

## II. Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.

U.S. Right to Know is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of NIH's activities regarding the search for the origin of COVID-19, as compared to the level of public understanding that existed prior to the disclosure. The records are also certain to shed light on the NIH's compliance with its own mission and purpose. Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA. Thus, U.S. Right to Know meets this factor as well.

## III. Obtaining the Requested Records is of No Commercial Interest to U.S. Right to Know

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to U.S. Right to Know's role of educating the general public. Founded in 2014, U.S. Right to Know is a 501(c)(3) nonprofit public interest, public health organization (EIN: 46-

5676616). U.S. Right to Know has no commercial interest and will realize no commercial benefit from the release of the requested records.

**IV. U.S. Right to Know's Primary Interest in Disclosure is the Public Interest.**

As stated above, U.S. Right to Know has no commercial interest that would be furthered by disclosure. Although even if it did have an interest, the public interest would far outweigh any pecuniary interest.[10]

U.S. Right to Know is a non-profit organization that informs, educates, and counsels the public regarding corporate wrongdoing and government failures that threaten the integrity of our food system, our environment and our health. U.S. Right to Know has been substantially involved in the activities of numerous government agencies for over eight years, and has consistently displayed its ability to disseminate information granted to it through FOIA.

In granting U.S. Right to Know's fee waivers, agencies have recognized: (1) that the information requested by U.S. Right to Know contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that U.S. Right to Know possesses the expertise to explain the requested information to the public; (4) that U.S. Right to Know possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes U.S. Right to Know as an established expert in the field of public health. U.S. Right to Know's track record of active participation in oversight of governmental activities and decision making, and its consistent contribution to the public's understanding of those activities as compared to the level of public understanding prior to disclosure are well established.

U.S. Right to Know intends to use the records requested here similarly. U.S. Right to Know's work appears frequently in news stories online and in print, radio and TV, including reporting in outlets such as *The New York Times* and *The Guardian*, as well as medical and public health journals such as the *BMJ*.  Many media outlets have reported about the food and chemical industries using information obtained by U.S. Right to Know from federal agencies. In 2023, nearly 500,000 people visited U.S. Right to Know's extensive website, and viewed pages more than 760,000 times. U.S. Right to Know and its staff regularly tweet to a combined following of more than 75,000 on Twitter, and 10,000 people follow U.S. Right to Know on Facebook,  U.S. Right to Know intends to use any or all of these media outlets to share with the public information obtained as a result of this request.

Public oversight and enhanced understanding of the NIH's duties is absolutely necessary. In determining whether disclosure of requested information will contribute significantly to public

---

[10] In this connection, it is immaterial whether any portion of U.S. Right to Know's request may currently be in the public domain because U.S. Right to Know requests considerably more than any piece of information that may currently be available to other individuals. *See Judicial Watch*, 326 F.3d at 1315.

understanding, a guiding test is whether the requester will disseminate the information to a reasonably broad audience of persons interested in the subject. *Carney*, 19 F.3d 807. U.S. Right to Know need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity." *Judicial Watch*, 326 F.3d at 1314. It is sufficient for U.S. Right to Know to show how it distributes information to the public generally. *Id.*

Please send the documents electronically in PDF format to Hana Mensendiek at hana@usrtk.org. If you need additional information please write Hana at the email address above.

Thank you so much for your help in filling this request.

Sincerely,

Hana Mensendiek
Investigator

Gary Ruskin
Executive Director

**EXHIBIT B**

**R**

**U.S. RIGHT TO KNOW**
*Pursuing truth and transparency for public health*

July 18, 2024

Gorka Garcia-Malene
Freedom of Information Officer
National Institutes of Health
Building 31 Room 5B35 9000
Rockville Pike Bethesda, MD 20892

Via email: nihfoia@mail.nih.gov

### RE: Freedom of Information Act request

Dear Mr. Garcia-Malene:

This is a two-part request under the Freedom of Information Act, 5 U.S.C. § 552, et seq., to the National Institutes of Health (NIH).

**Part I**. We seek records pertaining to the following NIH employee:

- Dr. Michael Lauer, Deputy Director for Extramural Research

We request all email communications - including CC, BCC, and attachments - to or from Dr. Lauer which contain the following email domain:

- @ecohealthalliance.org

NIH can limit the time frame of Part I of this request from January 1, 2024 to the present.

**Part II**. We seek documents sent on August 27, 2021 by Peter Daszak, President of EcoHealth Alliance, to Dr. Michael Lauer, Deputy Director for Extramural Research, NIH. The documents were sent to Dr. Lauer via a Dropbox link and included, among others, the following PDF documents:

1.  "01 WIV Documents.pdf" containing the following relating to NIH grant R01AI110964:
- WIV Subaward Contracts & Invoices Y1-Y5
- WIV Risk Assessment Matrixes 2016-2019
- WIV FFATA Reports from 2015-2019
- WIV Annual Reports 2014-2016
- WIV DHHS PHS NIH OLAW Approvals for 2014-2019 and 2019-2024
- WIV Subrecipient Monitoring 2016-2019

2.      "02 Duke-NUS Documents.pdf" containing the following relating to NIH grant UA01AI151797:

- Duke-NUS Subaward Contract
- Duke-NUS Subaward email and confirmation to NIAID
- Duke-NUS Risk Assessment Matrix
- Duke-NUS Audit
- Duke-NUS COI Policy


3.      "03 UNC Documents.pdf" containing the following relating to NIH grant UA01AI151797:

- UNC Subaward Contract and Invoices
- UNC Subaward email and confirmation to NIAID
- UNC Risk Assessment Matrix
- UNC Audit
- UNC COI Policy
- UNC Subrecipient Monitoring

The documents were sent as a response to Dr. Lauer's request for records and reports in a letter to EcoHealth Alliance dated July 23, 2021. A copy of the August 27, 2021 letter from EcoHealth Alliance containing the Dropbox link, as well as a copy of the July 23, 2021 letter from Dr. Lauer, are attached to this request (Attachments #1 and #2 respectively).

We request that you disclose these documents and materials as they become available to you, without waiting until all the documents have been assembled. If documents are denied in whole or in part, please specify which exemption(s) is (are) claimed for each passage or whole document denied. Give the number of pages in each document and the total number of pages pertaining to this request and the dates of documents withheld. We request that excised material be "blacked out" rather than "whited out" or cut out and that the remaining non-exempt portions of documents be released as provided under the Freedom of Information Act.

Please advise of any destruction of records and include the date of and authority for such destruction. As we expect to appeal any denials, please specify the office and address to which an appeal should be directed.

**REQUEST FOR FEE WAIVER**

FOIA was designed to provide citizens a broad right to access government records. FOIA's basic purpose is to "open agency action to the light of public scrutiny," with a focus on the public's "right to be informed about what their government is up to." *NARA v. Favish*, 541 U.S. 157, 171 (2004) quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773-74 (1989) (internal quotation and citations omitted). In order to provide public access to this information, FOIA's fee waiver provision requires that "[d]ocuments shall be furnished without any charge or at a [reduced] charge," if the request satisfies the standard. 5 U.S.C. § 552(a)(4)(A)(iii). FOIA's fee waiver requirement is "liberally construed." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003); *Forest Guardians v. U.S. Dept. of Interior*, 416 F.3d 1173, 1178 (10th Cir. 2005).

The 1986 fee waiver amendments were designed specifically to provide non-profit organizations such as U.S. Right to Know access to government records without the payment of fees. Indeed, FOIA's fee waiver provision was intended "to prevent government agencies from using high fees to discourage certain types of requesters and requests," which are "consistently associated with requests from journalists, scholars, and *non-profit public interest groups*." *Ettlinger v. FBI*, 596 F. Supp. 867, 872 (D. Mass. 1984) (emphasis added). As one Senator stated, "[a]gencies should not be allowed to use fees as an offensive weapon against requesters seeking access to Government information ... ." 132 Cong. Rec. S. 14298 (statement of Senator Patrick Leahy).

**I. U.S. Right to Know Qualifies for a Fee Waiver.**

Under FOIA, a party is entitled to a fee waiver when "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the [Federal] government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

Thus, the NIH must consider six factors to determine whether a request is in the public interest: (1) whether the subject of the requested records concerns "the operations or activities of the Federal government," (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities, (3) whether the disclosure "will contribute to public understanding" of a reasonably broad audience of persons interested in the subject, (4) whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities. *Id*. § 2.107(1)(2), (5) whether a commercial interest exists and its magnitude, and (6) the primary interest in disclosure. As shown below, U.S. Right to Know meets each of these factors.

    **A. The Subject of This Request Concerns "The Operations and Activities of the Government."**

The subject matter of this request concerns the operations and activities of the NIH. This request is about the NIH's knowledge of EcoHealth Alliance's coronavirus research activities in partnership with the Wuhan Institute of Virology.

This FOIA will provide U.S. Right to Know and the public with crucial insight into the activities of the NIH in relation to its knowledge of EcoHealth's research as it relates to the origins of COVID-19. It is clear that a federal agency's oversight of health, safety and security threats, both foreign and in the U.S. is a specific and identifiable activity of the government, and in this case it is the executive branch agency of the NIH. *Judicial Watch*, 326 F.3d at 1313 ("[R]easonable specificity is all that FOIA requires with regard to this factor") (internal quotations omitted). Thus, U.S. Right to Know meets this factor.

### B. Disclosure is "Likely to Contribute" to an Understanding of Government Operations or Activities.

The requested records are meaningfully informative about government operations or activities and will contribute to an increased understanding of those operations and activities by the public.

Disclosure of the requested records will allow U.S. Right to Know to convey to the public information about the NIH's activities in relation to EcoHealth's research as it relates to the origins of COVID-19. Once the information is made available, U.S. Right to Know will analyze it and present it to the general public in a manner that will meaningfully enhance the public's understanding of this topic.

Thus, the requested records are likely to contribute to an understanding of the NIH's operations and activities.

### C. Disclosure of the Requested Records Will Contribute to a Reasonably Broad Audience of Interested Persons' Understanding of the NIH's Activities Concerning the Origins of COVID-19

The requested records will contribute to public understanding of whether the NIH's actions concerning EcoHealth's research were consistent with its purpose and mission to "exemplify and promote the highest level of scientific integrity, public accountability, and social responsibility in the conduct of science." As explained above, the records will contribute to public understanding of this topic.

Activities of the NIH generally, and specifically its roles in research requiring high biosafety levels, are areas of interest to a reasonably broad segment of the public. U.S. Right to Know will use the information it obtains from the disclosed records to educate the public at large about this topic. *See W. Watersheds Proj. v. Brown*, 318 F. Supp.2d 1036, 1040 (D. Idaho 2004) (finding that "WWP adequately specified the public interest to be served, that is, educating the

4

public about the ecological conditions of the land managed by the BLM and also how ... management strategies employed by the BLM may adversely affect the environment").

Through U.S. Right to Know's synthesis and dissemination (by means discussed in Section II, below), disclosure of information contained in and gleaned from the requested records will contribute to a broad audience of persons who are interested in the subject matter. *Ettlinger v. FBI*, 596 F. Supp. at 876 (benefit to a population group of some size distinct from the requester alone is sufficient); *Carney v. Dept. of Justice*, 19 F.3d 807, 815 (2d Cir. 1994), *cert. denied*, 513 U.S. 823 (1994) (applying "public" to require a sufficient "breadth of benefit" beyond the requester's own interests); *Cmty. Legal Servs. v. Dep't of Hous. & Urban Dev.*, 405 F. Supp.2d 553, 557 (E.D. Pa. 2005) (in granting fee waiver to community legal group, court noted that while the requester's "work by its nature is unlikely to reach a very general audience," "there is a segment of the public that is interested in its work").

Indeed, the public does not currently have an ability to easily evaluate the requested records, which are not currently in the public domain. *See Cmty. Legal Servs.*, 405 F. Supp.2d at 560 (because requested records "clarify important facts" about agency policy, "the CLS request would likely shed light on information that is new to the interested public."). As the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1286 (9th Cir. 1987), "[FOIA] legislative history suggests that information [has more potential to contribute to public understanding] to the degree that the information is new and supports public oversight of agency operations... ."1[1]

Disclosure of these records is not only "likely to contribute," but is certain to contribute, to public understanding of NIH's activities related to EcoHealth Alliance's research activities, which are central to discussions about the origin of COVID-19. The public is always well served when it knows how the government conducts its activities. Hence, there can be no dispute that disclosure of the requested records to the public will educate the public about this pressing issue.

## II. Disclosure is Likely to Contribute Significantly to Public Understanding of Government Operations or Activities.

U.S. Right to Know is not requesting these records merely for their intrinsic informational value. Disclosure of the requested records will significantly enhance the public's understanding of NIH's activities regarding EcoHealth's research, as compared to the level of public understanding that existed prior to the disclosure. The records are also certain to shed light on the NIH's compliance with its own mission and purpose. Such public oversight of agency action is vital to our democratic system and clearly envisioned by the drafters of the FOIA. Thus, U.S. Right to Know meets this factor as well.

## III. Obtaining the Requested Records is of No Commercial Interest to U.S. Right to Know

Access to government records, disclosure forms, and similar materials through FOIA requests is essential to U.S. Right to Know's role of educating the general public. Founded in 2014, U.S. Right to Know is a 501(c)(3) nonprofit public interest, public health organization (EIN: 46-5676616). U.S. Right to Know has no commercial interest and will realize no commercial benefit from the release of the requested records.

**IV. U.S. Right to Know's Primary Interest in Disclosure is the Public Interest.**

As stated above, U.S. Right to Know has no commercial interest that would be furthered by disclosure. Although even if it did have an interest, the public interest would far outweigh any pecuniary interest.

U.S. Right to Know is a non-profit organization that informs, educates, and counsels the public regarding corporate wrongdoing and government failures that threaten the integrity of our food system, our environment and our health. U.S. Right to Know has been substantially involved in the activities of numerous government agencies for over eight years, and has consistently displayed its ability to disseminate information granted to it through FOIA.

In granting U.S. Right to Know's fee waivers, agencies have recognized: (1) that the information requested by U.S. Right to Know contributes significantly to the public's understanding of the government's operations or activities; (2) that the information enhances the public's understanding to a greater degree than currently exists; (3) that U.S. Right to Know possesses the expertise to explain the requested information to the public; (4) that U.S. Right to Know possesses the ability to disseminate the requested information to the general public; (5) and that the news media recognizes U.S. Right to Know as an established expert in the field of public health. U.S. Right to Know's track record of active participation in oversight of governmental activities and decision making, and its consistent contribution to the public's understanding of those activities as compared to the level of public understanding prior to disclosure are well established.

U.S. Right to Know intends to use the records requested here similarly. U.S. Right to Know's work appears frequently in news stories online and in print, radio and TV, including reporting in outlets such as *The New York Times* and *The Guardian*, as well as medical and public health journals such as the *BMJ*.  Many media outlets have reported about the food and chemical industries using information obtained by U.S. Right to Know from federal agencies. In 2023, nearly 500,000 people visited U.S. Right to Know's extensive website, and viewed pages more than 760,000 times. U.S. Right to Know and its staff regularly tweet to a combined following of more than 75,000 on Twitter, and 10,000 people follow U.S. Right to Know on Facebook. U.S. Right to Know intends to use any or all of these media outlets to share with the public information obtained as a result of this request.

Public oversight and enhanced understanding of the NIH's duties is absolutely necessary. In determining whether disclosure of requested information will contribute significantly to public understanding, a guiding test is whether the requester will disseminate the information to a

reasonably broad audience of persons interested in the subject. *Carney*, 19 F.3d 807. U.S. Right to Know need not show how it intends to distribute the information, because "[n]othing in FOIA, the [agency] regulation, or our case law require[s] such pointless specificity." *Judicial Watch*, 326 F.3d at 1314. It is sufficient for U.S. Right to Know to show how it distributes information to the public generally. *Id.*

Please send the documents electronically in PDF format to Emily Kopp at emily@usrtk.org. If you need additional information please call, rather than write, Emily at (770) 789-4628.

Thank you so much for your help in filling this request.


Sincerely,




Emily Kopp
Investigative Reporter

Hana Mensendiek
Investigator

Gary Ruskin
Executive Director

**EXHIBIT B-1**



27 August 2021

Dr. Michael S. Lauer
National Institutes of Health
9000 Rockville Pike
Bethesda, Maryland 20892

Dear Dr. Lauer,

In response to your requests for (1) records and (2) reports in your letter dated 23 July 2021, we provide the following responses and documentation. The requested files are too large to transmit via email, so they may be downloaded via the following Drop Box link. Let us know, if another method of file transfer would be preferred.

Drop Box Link:

(b) (6)

Responses:

### 1. Records

**R01AI110964**
01 WIV Documents.pdf
1. WIV Subaward Contracts & Invoices Y1-Y5
2. WIV Risk Assessment Matrixes 2016*-2019
3. WIV FFATA Reports from 2015-2019
4. WIV Annual Reports 2014-2016
5. WIV DHHS PHS NIH OLAW Approvals for 2014-2019 and 2019-2024
6. WIV Subrecipient Monitoring 2016*-2019
*EcoHealth Alliance began a formal Uniform Guidance subrecipient monitoring policy in 2016 as per OMB Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR §200.331).
02 EHA FFRs from 2014-2019.pdf

**U01AI151797**
01 Chulalongkorn Documents.pdf
1. Chulalongkorn Subaward Contract and Invoices
2. Chulalongkorn Subaward email and confirmation to NIAID

1

   3. Chulalongkorn Risk Assessment Matrix
   4. Chulalongkorn Audit
   5. Chulalongkorn COI Policy
   6. Chulalongkorn Subrecipient Monitoring

02 Duke-NUS Documents.pdf
   1. Duke-NUS Subaward Contract*
   2. Duke-NUS Subaward email and confirmation to NIAID
   3. Duke-NUS Risk Assessment Matrix
   4. Duke-NUS Audit
   5. Duke-NUS COI Policy

*Contract signed in Aug 2021, so Duke-NUS Subrecipient Monitoring form will be available early 2022*

03 UNC Documents.pdf
   1. UNC Subaward Contract and Invoices
   2. UNC Subaward email and confirmation to NIAID
   3. UNC Risk Assessment Matrix
   4. UNC Audit
   5. UNC COI Policy
   6. UNC Subrecipient Monitoring

04 FSRA-FFATA EID-SEARCH.pdf

In addition to the records listed above, we are fully in compliance with the award conditions for U01AI151797. Specifically, from the NoA language: (a) all subaward contract agreements including descriptions of biosafety monitoring plans and (b) proof of documentation of timely entries of subaward information into the FSRS reporting have been provided to our NIAID Program Officer and Grants Management Specialist within 30-days of establishment of the subaward contract or submitting subaward information to the FSRS, respectively. In the files above and following each Subaward Contract and Invoices, we have documentation of emails and responses of these reports and communications.

**U01AI153420**
01 icddrb Documents.pdf
   1. icddr,b Subaward Contract and Invoices
   2. icddr,b Risk Assessment Matrix
   3. icddr,b Audit
   4. icddr,b COI Policy
   5. icddr,b Subrecipient Monitoring

02 IEDCR Documents.pdf
   1. IEDCR Subaward Contract and Invoices
   2. IEDCR Risk Assessment Matrix
   3. IEDCR Desk-Audit Questionnaire *in lieu of Audit document*
   4. IEDCR COI Policy
   5. IEDCR Subrecipient Monitoring

03 FSRS-FFATA Nipah Bangladesh.pdf

## 2. Reports

a. The interim report (I-RPPR) for R01AI110964 has been submitted via the Interim-RPPR option in the eRA Commons system. Program Officer Erik Stemmy and Grants Management Specialist Shaun Gratton have been notified.

b. Documentation of our submission of all quarterly FFR reports for years 1-6 (2014-2019) for R01AI110964 are included in the Drop Box link, above. Note that following the notice of award for 2R01AI110964 (24-July-19), its termination (27-Apr-20), subsequent of suspension (15-Jul-20), there was a change (01 Jan 21) to the process by which FFRs are required to be submitted such that the US DHHS Payment Management System (PMS) is now used instead of eRA Commons. The PMS does not recognize our previously-terminated, now-suspended grant number and we have requested that the PMS update their system to approve this grant number (update request number UPDA0229501). We have followed up as recently as this morning 8/27/21 (ticket number 264975). As soon as PMS updates their system, we will submit the report and notify our program officer and grants management specialist and send documentation.

c. Reporting for U01AI151797, and U01AI153420 is up to date.

If any additional details or information are required, please let us know. We look forward to hearing from you.

Sincerely,



Peter Daszak, PhD
President, EcoHealth Alliance

Aleksei Chmura, PhD
Chief of Staff & AOR

**EXHIBIT B-2**

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

National Institutes of Health
National Institute of Allergy
and Infectious Diseases
Bethesda, Maryland 20892

23 July 2021

Drs. Aleksei Chmura and Peter Daszak
EcoHealth Alliance, Inc.
460 W 34th St
Suite 1701
New York, NY 10001

Re: R01AI110964, U01AI151797, U01AI153420

Dear Drs. Chmura and Daszak:

Thank you for your correspondence of April 11, 2021 and April 23, 2021 regarding
R01AI110964. We are in the process of conducting detailed analyses of your answers to our
questions and well as of the documents you sent, and we have the following additional requests:

1. Records

For us to continue our analyses, we will need to receive and review WIV's records validating
expenditures specific to R01AI110964 as well as any and all monitoring, safety, and financial
reports specific to R01AI110964 that WIV submitted to you. As a reminder, subawardees are
required to have a financial management system that includes records that identify adequately
the source and application of funds for federally-funded activities. These records must contain
information pertaining to Federal awards, authorizations, obligations, unobligated balances,
assets, expenditures, income and interest and be supported by source documentation. 45 C.F.R.
§§ 75.101 and 75.302.

As a term and condition of award, NIH "must have the right of access to any documents, papers,
or other records of the non-Federal entity which are pertinent to the Federal award, in order to
make audits, examinations, excerpts, and transcripts" (45 C.F.R. 75.364). This right of access
applies not only to awardee records, but also to subawardee records. Awardees indicate their
acceptance of an NIH award and its associated terms and conditions as they draw down the NIH
grant funds to support the scientific project (see NIHGPS Section 5).



 National Institute of Mental Health

EcoHealth Alliance, Inc., Page 2
23 July 2021

We will also need to see subaward agreements, subawardee audit reports, subawardee safety monitoring documents, subawardee progress reports submitted to you, and subawardee financial and accounting records for two other NIH EcoHealth Alliance grants.  Specifically, please send us all responsive documents for:

- U01AI151797 (Daszak): subawardees Chulalongkorn Hospital, Chulalongkorn University, Duke-National Singapore University, and University of North Carolina at Chapel Hill
- U01AI153420 (Epstein): subawardees International Center for Diarrhoeal Disease Research of Bangladesh, Institute of Epidemiology Disease Control and Research of Bangladesh.

We remind you that the Notice of Award for U01AI151797 already contains the following specific award conditions that must still be satisfied by 30 days from establishment.

Subaward Agreement Requirements:  The ECOHEALTH ALLIANCE, INC. must provide NIAID with copies of all (existing and newly established) subaward agreements established under this award, including descriptions of the biosafety monitoring plans, within 30 days of establishment.

Federal Funding Accountability and Transparency Subaward Reporting System (FSRS) Requirements:  This award is subject to the Transparency Act subaward reporting requirement of 2 CFR Part 170, which must be reported through the Federal Funding Accountability and Transparency Subaward Reporting System (FSRS). The ECOHEALTH ALLIANCE, INC. must provide NIAID with proof of documentation of timely entries of subaward information into the FSRS within 30 days of submitting to FSRS.

2. Reports

We are also writing to notify you that a review of our records for R01AI110964 indicates that EcoHealth Alliance, Inc. is out of compliance with requirements to submit the following reports that are outlined in the NIHGPS:  the Federal Financial Report (FFR, see 8.4.1.2.3 Modified Financial Reporting Requirements) and the Interim Research Performance Progress Report (I-RPPR, see NIHGPS 8.4.1.4 Final Research Performance Progress Report).

R01AI110964 was issued under the Streamlined Noncompeting Award Process (SNAP).  For awards under SNAP, an FFR must be submitted within 120 days after the end of the competitive segment and must report on the cumulative support awarded for the entire segment.

Additionally, NIH requires that organizations submit an Interim-RPPR while their Type 2 application is under consideration. In the event that the Type 2 is funded, NIH treats the Interim-RPPR as the annual performance report for the final year of the previous competitive segment.

EcoHealth Alliance, Inc., Page 3
23 July 2021

The FFR and I-RPPR for R01AI110964 were due within 120 days after the end of the project period. In this case, the competitive segment ended on May 31, 2019, and reports were due September 30, 2019. To date, NIH has still not received these reports. Compliance with Section 8, Administrative Requirements within the NIH Grants Policy Statement (NIHGPS) is a standard term and condition of award that applies to all NIH recipients.

A recipient's failure to comply with the terms and conditions of award, may cause NIH to take one or more actions on the award, depending on the severity and duration of the non-compliance. Additionally, a history of non-compliance related to R01AI110964, including reporting non-compliance, may impact other projects where EcoHealth serves as the primary grant recipient. When a recipient has a history of failure to comply with the general or specific terms and conditions of a previous Federal award, NIH may impose specific award conditions on other awards of the recipient, including withholding authority to proceed to the next phase of a project until receipt of evidence of acceptable performance (see NIHGPS Section 8.5, Remedies for Noncompliance or Enforcement Actions: Suspension, Termination, and Withholding of Support).

In closing, please be advised that EcoHealth Alliance, Inc. must satisfy the existing specific award condition for U01AI151797 by 30 days from establishment and must provide the remaining documents and reports requested herein for all three grants (R01AI110964, U01AI151797, U01AI153420) no later than August 27, 2021.

Please let me know if you have any questions concerning the information in this letter.

Sincerely,

Lauer, Michael (NIH/ Digitally signed by Lauer,
OD) [E]                Michael (NIH/OD) [E]
                       Date: 2021.07.23 17:24:01 -04'00'

Michael S Lauer, MD
NIH Deputy Director for Extramural Research
(b) (6)

cc:     Ms. Emily Linde
        Dr. Erik Stemmy

**EXHIBIT C**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

US RIGHT TO KNOW

     Plaintiff,


        v.                                                          Case No. 23-cv-02954


NATIONAL INSTITUTES OF HEALTH

     Defendant.

## DECLARATION OF GORKA GARCIA-MALENE

     I, Gorka Garcia-Malene, declare that the following enumerated statements are true and correct to the best of my knowledge:

     1.     I am the Freedom of Information ("FOIA") Officer for the National Institutes of Health ("NIH"), U.S. Department of Health and Human Services ("HHS" or the "Department"). I have held this position since October 15, 2017.

     2.     As the NIH FOIA Officer, I am responsible for supervising and directing the day-to-day activities of the NIH FOIA Office (hereinafter, "NIH-FOIA"), the central office responsible for responding to FOIA requests for records from all operating divisions of the NIH. In my position, I determine whether to release or withhold records, or portions of records, in accordance with the FOIA and the HHS implementing regulations. I also coordinate efforts, as necessary, when one or more of the NIH Centers/Institutes/Offices is involved in responding to a FOIA request.

1

3.      The statements contained in this declaration are based upon my personal knowledge, upon information  available to me in my official capacity as the NIH FOIA Officer, including information supplied to me by employees under my supervision or employees in other NIH offices, and upon conclusions I reached based on that knowledge or information.

4.      The purpose of this declaration is to explain the processing of the FOIA requests at issue in the above-captioned litigation and support NIH's proposed processing schedule. Given NIH's substantial FOIA caseload and limited staffing, NIH is able to process the remaining pages at issue in this matter at a rate of 300 pages a month.

### NIH-FOIA's Standard Review Process

5.      NIH is the nation's medical research agency, seeking to make discoveries that improve health and save lives.  It is made up of 27 different components, each of which has its own research agenda.

6.      Historically, FOIA operations at NIH are decentralized in that each of NIH's 27 different components have their own FOIA coordinators. Requesters are encouraged to send their requests to the NIH component with responsibility for the program to which the requested records relate. Upon receipt of a FOIA request, the NIH component to whom the request is directed is responsible for logging the request into the NIH-wide FOIA Tracking System and coordinating the search for and processing of responsive records for subsequent release.

7.      The FOIA coordinators at NIH's various components report to me for purposes of FOIA request management and processing.

8.      When responding to a FOIA request, the NIH-FOIA staff conducts a page-by-page, line-by-line review of all potentially responsive records to determine whether the document is responsive to the request, whether the information is publicly available, whether information

2

should be withheld under one or more of the nine exemptions to the FOIA, and whether the records contain equities of other federal agencies or third-party stakeholders. During the review process, FOIA coordinators will consult with HHS or NIH program offices, federal agencies, or any other stakeholders of the records involved, as appropriate.

### Receipt of Plaintiff's FOIA Requests

9.      On November 5, 2021, NIH-FOIA received a two-part FOIA request from Plaintiff via email. Part One of this FOIA request sought "email correspondence to or from Dr. Stemmy, Dr. Michael Lauer, Jenny Greer, and Philip Smith" with "@ecohealthalliance.org OR "EcoHealth Alliance" and "@wh.iov.cn OR "Wuhan Institute of Virology." Part Two of this FOIA request sought "email correspondence to or from Dr. Stemmy" with seven named individuals or email addresses. The date range for this request was "11/1/2013 to 1/1/2018."

10.      NIH-FOIA acknowledged this request on February 24, 2022**,** and assigned it the tracking number 57943. Our program typically receives FOIA requests via our electronic FOIA review platform. That platform accepts the requests, adds it to our queue and sends an acknowledgment response in an automated fashion. Because this request was submitted via email rather than our FOIA review platform and my team did not immediately see that email, acknowledgment of this request was processed manually after it was retrieved from our email systems. At that time, we entered the request according to our normal processes.

11.      On January 21, 2022, NIH-FOIA received a second FOIA request from Plaintiff via email. This FOIA request sought "records of all email correspondence to or from Dr. Morens" with "@ecohealthalliance.org" and "EcoHealth Alliance." The date range for this request was from "1/1/2016 to the present."

12.     NIH-FOIA acknowledged this request on January 31, 2022, and assigned it the tracking number 57707.

**Processing of Plaintiff's FOIA Requests**

13.     When NIH-FOIA receives a FOIA request, NIH endeavors to initiate the search as soon as possible. The search results remain in queue in the order in which they were received until assigned to an analyst for review.

14.     NIH-FOIA initiated a search in response to Plaintiff's November 5, 2021 FOIA request (hereinafter "Stemmy et al. FOIA Request") on February 24, 2022. NIH received the results of the search on various dates, as different offices processed the search. The last response to our request for records was returned on August 26, 2022.

15.     On January 21, 2022, the same day that NIH-FOIA received Plaintiff's second FOIA request (hereinafter "Morens FOIA Request"), NIH-FOIA ordered a search for potentially responsive records. On January 31, 2022, NIH-FOIA received the results of this search.

16.     These requests then remained in our queue as the NIH FOIA processed records from earlier requests, including those of Plaintiff.

17.     During the pendency of this litigation, NIH received notice that Dr. Morens forwarded emails he deemed work-related from his personal account to his NIH Outlook email account. When NIH-FOIA learned that those emails were available in Outlook, relevant searches were re-run on his work email account and potentially responsive pages resulting from those supplemental searches were added to the count of potentially responsive pages pending processing.

18.     On August 3, 2023, we received notice of this litigation, filed June 15, 2023.

19.     NIH-FOIA subsequently began discussions with Plaintiff regarding how the 6,475 pages of potentially responsive records would be processed. The parties reached an agreement that

NIH-FOIA would (1) prioritize processing of records identified to date from Dr. Morens' personal Gmail account, (2) process records at a rate of at least 200 pages per month, and (3) complete processing of the 6,475 pages by June 30, 2025.

20.     Consistent with this agreement, NIH-FOIA has (1) prioritized processing records within the 6,475-page record set that originated from Dr. Morens' personal Gmail account, (2) reviewed 200 or more pages of records each month and issued monthly releases of all responsive, non-exempt material, to date, and (3) remains on track to complete all processing by June 30, 2025. Approximately 1,050 pages remain, consisting of pages that required consultation with other agencies.

**Newly Received Documents from Dr. Morens' Gmail Account**

21.     Separate from this lawsuit and any FOIA matter, NIH was involved in efforts to recover agency records that Dr. Morens, an employee of NIH at the time the referenced efforts were made, sent from his personal Gmail account. Those efforts resulted in the retrieval of certain Gmail records. These Gmail records were included in NIH-FOIA's search for potentially responsive records, resulting in the initial 6,475-page record set.

22.     On or around July 17, 2024, NIH-FOIA received a set of 65,000 pages of documents in PDF format from NIAID leadership. NIH-FOIA was informed by NIAID leadership that these documents were obtained from Dr. Morens' personal attorney. At the time, Dr. Morens was still an NIH employee.

23.     Immediately upon receipt, NIH-FOIA sought to notify Plaintiff of the existence of these documents and proceeded to voluntarily broaden the scope of its review by conducting a search using the parameters listed in the Morens FOIA Request, referenced in paragraph 7, across the newly received Morens collection.

24. Specifically, NIH-FOIA conducted a keyword search using the search term "EcoHealth." This search resulted in approximately 43,000 pages of potentially responsive documents.

25. Given the volume of pages resulting from the initial keyword search, NIH-FOIA has sought to confer with Plaintiff on narrowing and refining search terms to better tailor the request to target the specific material Plaintiff seeks.

26. In an effort to engage in meaningful dialogue regarding narrowing, NIH-FOIA has offered constructive suggestions and invested considerable NIH-FOIA resources to conduct numerous searches. NIH-FOIA's attempts at negotiating a narrowing agreement include the following:

(1) Offered Plaintiff the opportunity to identify topics of interest to narrow the 43,000-page set;

(2) Based on context and our experience with Plaintiff's other FOIA requests, NIH suggested four sets of search terms, conducted keyword searches of the 43,000-page set using these search terms, and provided corresponding page counts, as follows:

    i. "origin" AND "covid": 14,000 pages.
    ii. "EcoHealth" AND "covid": 22,953 pages
    iii. "EcoHealth" AND "origin": 15,207 pages
    iv. "EcoHealth" AND "("covid" AND "origin"): 14,117 pages.

(3) Provided Plaintiff a random sampling of 80 pages from the 43,000-page set to help Plaintiff identify potential search terms; and

(4) Conducted 21 searches of the 43,000-page set using terms Plaintiff suggested and provided the following counts of items and pages resulting from those searches:

    i. DEFUSE: 117 items, 2990 pages

    ii.  DARPA: 206 items, 4,339 pages
   iii.  Private funding: 34 items, 1203 pages
   iv.  Furin: 349 items, 15,312 pages
    v.  ACE2: 291 items, 23,022 pages
   vi.  Progenitor: 156 items, 7,202 pages
  vii.  Union of Concerned Scientists: 108 items, 2,832 pages
 viii.  Wuhan Institute of Virology: 1,131 items, 15,602 pages
   ix.  WIV (all caps): 848 items, 12, 253 pages
    x.  Restriction: 131 items, 19,661 pages
   xi.  Bsal: 0 items
  xii.  BsmBI: 9 items, 245 pages
 xiii.  Database: 489 items, 27,047 pages
 xiv.  Yunnan: 263 items, 7148 pages
  xv.  Mojiang: 49 items, 844 pages
 xvi.  Baric: 437 items, 12,399 pages
 xvii.  biosafety: 716 items, 20,956 pages
xviii.  BSL: 348 items, 10,728 pages
 xix.  Ben Hu: 14 items, 951 pages
  xx.  gain of function: 944 items, 14,151 pages
 xxi.  gain-of-function: 944 items, 14,151 pages

27.    In total, NIH-FOIA has conducted 25 additional searches of the 43,000-page set. Despite these extensive efforts, Plaintiff has wholly rejected each and every narrowing proposal.

28.    Plaintiff has raised issue with the form of these documents, seeking to obtain these documents in native format with metadata. However, it is standard practice in FOIA processing to provide records in PDF format, which would not include metadata. Additionally, NIH is unable to obtain a copy of these documents in native format.

29.    While NIH retains control over the versions of these emails that have been integrated into NIH systems, it does not maintain control over emails within a personal Gmail account. Dr. Morens is no longer an NIH employee. While NIH may exercise leverage over its employees to cooperate with its requests, NIH lacks the authority to demand that a member of the public comply with a request to maintain emails and reproduce emails that have existed on a personal Gmail account.

30.     Moreover, metadata would only prove useful for narrowing the scope of the search. However, despite NIH's extensive efforts to focus the search to Plaintiff's particular interests, Plaintiff has refused to narrow the scope of the request. Consequently, metadata is of no use in the context of this litigation.

31.     NIH-FOIA has diligently complied with the standing agreement to process at least 200 pages per month.  In a show of good faith, NIH-FOIA has offered to increase its monthly processing rate beyond the standing agreement, to process at least 300 pages per month.

### NIH-FOIA Workload

32.     NIH-FOIA's processing rate of 300 pages per month capitalizes on its workflow and ensures that more pages for more requestors are processed each month.  This allows for fair and equitable processing of all NIH FOIA requests.  This is particularly true in light of the demands posed by the growing number, size, and complexity of FOIA requests received by NIH, and the constraints of reduced staffing.  Implementing an extreme page review requirement, as requested by Plaintiff in this litigation, would result in a diverting of a disproportionate share of agency resources from responding to a myriad other FOIA requests, to a single FOIA requester.

33.     During Fiscal Year (FY) 2024 alone, NIH received 1,758 new FOIA requests.[1] While gains in efficiencies allowed NIH-FOIA to process 1,688 requests, 1,007 remained pending at the end of the fiscal year. NIH currently has 1,313 pending FOIA requests in queue, 880 of which are backlogged requests from prior years.

34.     In addition to the demands of processing new and backlogged FOIA requests, NIH has experienced a steady increase in litigations. Presently, NIH has 62 active litigations.  Plaintiff

---

[1] *See* HHS Fiscal Year 2024 Freedom of Information Annual Report, *available at* https://www.hhs.gov/foia/reports/annual-reports/2024/index.html.

8

alone has four active litigations with NIH, requiring NIH-FOIA to process 1,000 pages each month solely for Plaintiff's FOIA requests in active litigation.

35.     NIH-FOIA must also balance the demands of increased FOIA requests and litigations with the limitations of reduced staffing. Pursuant to ongoing initiatives to reduce staffing across the federal government, NIH is projected to cut total FOIA staffing by more than 40 percent within the next month.

36.     As of June 2, 2025, the NIH FOIA Office of the Director – where FOIA litigations are processed, is anticipated to retain eight personnel. Of the remaining eight personnel, one staff member is responsible for administrative tasks and three staff members are assigned to process new FOIA requests, backlogged FOIA requests, and appeals. The litigation team is projected to be cut in half, with four staff remaining, one team lead managing FOIA litigations full time and three staff members balancing a workload of FOIA litigations, appeals, and non-litigation requests.

37.     NIH is simply unable to process potentially responsive records at a rate greater than 300 pages per month. Any large page review requirement, even one not as large as that requested by Plaintiff, would stress NIH-FOIA operations, interfere with NIH's ability to meet agreed-upon and court-imposed deadlines in other FOIA litigations, create serious consequences for other requesters, and lead to further delays in processing requests, and other complications.

38.     Accordingly, based on the foregoing, I aver that NIH cannot increase its processing rate for the remaining documents at issue in this litigation beyond 300 pages per month.

39.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing to be true and correct, to the best of my knowledge, information, and belief.

Executed this 13th day of May 2025

GORKA GARCIA-MALENE -S   Digitally signed by GORKA GARCIA-MALENE -S
Date: 2025.05.13 15:04:05 -04'00'

GORKA GARCIA-MALENE